UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JOHN SIMS,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>ORTH, DWAN, GARCIA, WHEELER,<br>RAGLIN, ROBINSON, MONERPENNY,<br>FRANCIS, and WARDEN,<br><br>　　　Defendants. | CAUSE NO. 3:24-CV-672-JD-AZ |

OPINION AND ORDER

John Sims, a prisoner without a lawyer, filed this lawsuit about the medical care he has been receiving at Westville Correctional Facility since his transfer there in December 2023. ECF 2. He was allowed to proceed in forma pauperis despite having incurred three "strikes" under 28 U.S.C. § 1915(g) based on allegations that he was under imminent danger of serious physical injury from unmet medical needs. ECF 10, 11. He alleges he is being denied constitutionally adequate medical treatment for seizures, strokes, chest pain, heart attacks, and blood in his stool. He is proceeding against several defendants for money damages and against Westville's Warden for injunctive relief to receive constitutionally adequate medical care. ECF 11. The court construed the complaint to include a motion for a preliminary injunction and ordered the Warden to respond. ECF 12. He has done so, and Sims has replied.[1] ECF 34, 45.

---

[1] After Sims filed his reply, he filed an additional reply. ECF 47. In that additional reply, Sims asserts that he is currently not being treated for an illness that is causing him to throw up and have no

FACTS

On December 19, 2023, Sims was transferred to Westville Correctional Facility, where he has been kept in restricted housing. ECF 34-1 at 1; ECF 34-2. Regarding his medical care, he is seen regularly for mental health monitoring (which he does not challenge in this lawsuit), and he receives Chronic Care for hypertension. ECF 34-1 at 2. He receives daily hypertension and mental health medication. ECF 34-1 at 3; ECF 34-2 at 2; ECF 34-3. These facts detail the medical exams he has received since his transfer.

On January 9, 2024, Sims had a Chronic Care Visit and a Chart Update. ECF 34-5. At that visit, the provider determined that Sims' hypertension was under control. *Id.* at 3. The provider noted that Sims had complained of abdominal pain a week ago and had received several tests, including a urine analysis, stool culture, and labs checking lipase and amylase levels. *Id.* at 3. The tests all came back normal, and the abdominal pain resolved. *Id.* at 3. At the visit, Sims complained of shortness of breath, chest pain, and abdominal pain, but the provider found no problems with Sims' respiratory, cardio, or GI systems. *Id.* at 4.

On February 15, 2024, Sims was seen by a nurse for complaints of "little bumps under his chest," which had been there for the past three years. ECF 34-7 at 1-2. He did not report any pain, drainage, or itching; there were no infected hairs, redness, or pustules; and the bumps were soft to the touch. *Id.* Sims also reported a larger lump on the left side of his neck that appeared 3-4 months ago. *Id.* The nurse saw no signs of

---

control over his bowel movements. He complains that he has turned in a health care request form, but no one has seen him because staff shortages have caused a backlog of request forms. How Sims is being treated for this illness is outside the scope of this case and will not be discussed further.

2

infections in the lump. *Id.* The nurse consulted with the provider, who ordered hydrocortisone cream to be applied to the area twice a day for 30 days. *Id.* In his reply, Sims says that the hydrocortisone did not decrease the bumps on his chest, and in fact they have spread. ECF 45 at 4. He asserts that he has put in three more health care request forms to be seen about the bumps, but nothing was done. *Id.*

On March 8, 2024, Sims was seen by a nurse in response to a health care request form, asking to be checked for a brain tumor and blood clots. ECF 34-8 at 1. He told the nurse that he has been getting headaches more than usual over the past year, and he would like a "head to toe" scan of his body to check for blood clots. *Id.* at 3. He reported that his mother was just diagnosed with a brain tumor or a blood clot in her leg. *Id.* The nurse did not note any swelling or shortness of breath. *Id.* Sims' lungs were both clear and he reported no pain during the exam. *Id.* Based on these findings, the provider ordered several blood tests, including a comprehensive blood count with differential, a comprehensive metabolic panel, and tests that measured blood clotting. *Id.* at 2-3.

Sims says that on March 18, 2024, he complained of chest pain to Nurse Okechukwu Ekeh when he was passing out night medication, but the nurse did nothing. ECF 45 at 4. Simms contends that chest pain is a medical emergency, and Nurse Ekeh should have evaluated him that night but didn't. *Id.*

On March 19, 2024, Sims was seen by a nurse in response to a health care request form in which he complained about his back hurting. ECF 34-9 at 1. He attributed his back pain to his mattress being too hard. *Id.* at 2. He was prescribed Tylenol for the next fourteen days. *Id.*

A week later, a nurse reported that during medication pass on March 25, 2024, Sims said he was having back pain and complained about his health needs being ignored. ECF 34-10 at 4. When the nurse reminded him that he was seen on March 19 and given Tylenol for his back pain, Sims reported that he also had chest pains. *Id.* He was then given a cardiac evaluation, including an EKG. *Id.* at 2-3. Sims reported that the pain was mostly in his back, not in his chest. *Id.* at 4. It starts when he eats and lasts ten minutes. *Id.* Medical staff concluded that no further action was required and recommended that he eat frequent, light meals. *Id.* at 3. Sims complains about not receiving anything further to help ease his back pain, which Tylenol had not resolved. ECF 45 at 4. Another EKG was performed a few days later on March 28, 2024, and the results were normal. ECF 34-11 at 1.

On April 9, 2024, Sims was seen by a nurse in response to a health care request form regarding swelling to his feet and ankles. ECF 34-12 at 1. The nurse noted "2+ edema to lower extremities and ankles/feet."[2] *Id.* at 2. He denied having chest pain, dizziness, or headaches, and his vitals were within normal limits. *Id.* at 2. He was advised to lower his sodium intake and educated on which foods to avoid. *Id.* Sims replies that the nurse's instruction on watching what he eats did not address his medical need. ECF 45 at 4. As an inmate, he can eat only what they give him. *Id.*

---

[2] The degree of edema, or fluid buildup, is graded on a scale of 1 to 4 based on how deep the swollen area pits when pressed and how long the pit lasts after the area is pressed. A score of 1+ applies when the pit is barely visible, contrasted with a score of 4+, which applies when the pit is deep and takes more than 30 seconds to go away. A score of 2+ applies when there is a slight pit that goes away within 15 seconds. *See* Stephanie Booth, *Pitting Edema*, WEBMD (Aug. 4, 2024) https://www.webmd.com/heart-disease/pitting-edema (last visited Dec. 18, 2024).

4

On April 11, 2024, Sims was scheduled for a lab draw, but he signed a refusal to submit to the lab draw. ECF 34-13; ECF 34-14. Sims explains that he refused the blood draw only after the nurse had stuck him with a needle more than 15 times and could not find a vein. ECF 45 at 5. When he complained that she was hurting him, the officer present told him to "take it like a man, like you molested those kids" and then started threatening him. *Id.* Sims then refused the lab draw because his life was threatened by the officer. *Id.*

A nurse conducted a wellness check on April 18, 2024, because of a report that Sims was recently assaulted by custody staff, who he said threw him on his bed and then punched and kneed him in his back and sides. ECF 34-15 at 2. He also stated that there was a razor blade in his food that he believed was put there by custody staff. *Id.* The nurse did not see any visible injuries to his core, arms, legs, head, or face. *Id.* She reported that Sims stated he was not in pain at that time and did not need any immediate medical interventions. *Id.* Sims says that at the wellness check, he complained about seizures, strokes, chest pain, heart attacks, blood in his stool, and other medical issues. ECF 45 at 5. But the custody staff told the nurse to let him die because he's a child molester. *Id.*

On May 21, 2024, Sims was seen for a nurse visit in response to a health care request form reporting that he had been feeling dizzy and lightheaded when he stands or sits up. ECF 34-17 at 1. The nurse checked his orthostatic blood pressure and found that was not the reason for his dizziness. *Id.* at 3. While there, Sims complained of back pain and headaches for the past year, stating that it feels like a migraine. *Id.* He said he

5

was not doing stretches to help the back pain, and so he was given stretches to relieve the pain. *Id.*

On July 8, 2024, Sims submitted two health care request forms about feeling depressed and anxious because his cell flooded with sewage the day before, and the staff would not do anything about it. ECF 34-19 at 1-2. He reported that he had a panic attack because of it, and now it is hard for him to breathe and his chest hurts. *Id*. at 1. He was seen for a nurse visit the same day. ECF 34-20. By the time he was seen, he reported that he felt fine and did not have any shortness of breath or chest pain. *Id.* at 3. His vital signs were within normal limits, his lungs were clear, and his breathing was equal and unlabored. *Id.* The nurse educated him on breathing and meditation to do if this happened again and told him to report any future signs or symptoms right away. *Id.*

The next week, Sims submitted two medical request forms because he was dizzy and lightheaded, and he stated that he had a seizure. ECF 34-21 at 1, 3. A nurse assessed him at his cell front on July 15, 2024. *Id.* at 3. The nurse noted that Sims had no history of seizures and the one he reported was unwitnessed. *Id.* at 2. The nurse did not see signs of acute distress, and Sims' vital signs were within normal limits. *Id.* Lab tests were ordered. *Id.* Sims replies that seizures run in his family and he has complained about having seizures at other facilities. ECF 45 at 6. He argues that no one is ever likely to witness a seizure because he is alone in his cell 24 hours a day and custody staff don't walk by every 30 minutes like they are supposed to. *Id.*

On July 30, 2024, Sims had a Chronic Care Visit. ECF 34-24 at 3. At that visit, Sims told the provider about feeling lightheaded and dizzy and reported there was

blood when he wiped after using the toilet. *Id.* The provider noted that recent lab work showed that Sims was anemic, but his blood pressure was under control on the current medication. *Id.* He referred Sims to an outside provider for a colonoscopy. *Id.* at 1-3. The colonoscopy request has been approved and one has been scheduled, but the date of the scheduled procedure is confidential for safety and security reasons. ECF 34-1 at 4-5.

Sims was next seen for a nurse visit on October 1, 2024, in response to several healthcare request forms, which included complaints of swelling to his ankles and feet, rib pain, bumps on chest, constipation, blood in stool, and suspected seizures. ECF 34-25 at 1-2. Sims stated that he occasionally wakes up on the floor and is confused how he got there. *Id.* at 2. He denied incontinence or having injuries upon awakening. *Id.* Sims reported that the bumps on his chest have been there for several years; the nurse noted that there was no head on them, there was no drainage, and they were not painful or itching. *Id.* at 3. The nurse categorized Sims' ankles as 1+ swelling nonpitting. *Id.* He stated that he has a bowel movement every two days but has trouble going at times. *Id.* After evaluating him, the nurse sent him back to his cell in stable condition. *Id.* at 3.

There are no records of Sims turning in a healthcare request after the visit on October 1, 2024. ECF 34-1 at 5. Further, none of the healthcare request forms in Sims' record from January 2024 through the filing of the Warden's response complained of strokes or heart attacks. *Id.* Sims replies that he has turned in health care request forms about heart attacks and strokes to Nurse Ekeh and to Nurse Dawn Schilling, but they never turn them in because they don't like him since he's a child molester and needs to die. ECF 45 at 6. He has raised these issues at other medical visits, but the nurses don't

7

address them and tell him to submit a health care slip about it. *Id.* Sims says he has, but still has not been seen. *Id.* Sims reports that Nurse Katie A. Jacobs told him that there are more than 50 health care slips they have not gotten to yet because they are short staffed, and Sims, himself, is waiting to be seen on at least 15 health care slips that he has put in. *Id.*

## ANALYSIS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id*. at 763 (quotation marks omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022).

8

Instead, the court must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions— "those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in correctional setting).

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove an Eighth Amendment violation, a prisoner must demonstrate (1) he had an objectively serious medical need and (2) the defendant acted with deliberate indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Inmates are "not entitled to demand specific

9

care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. Negligence or medical malpractice does not establish an Eighth Amendment violation. *Walker*, 940 F.3d at 965. Instead, courts "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Id.* (citation and internal quotation marks omitted).

The records before the court reflect that Sims has received significant medical care at Westville. In less than a year, Sims has been seen more than 10 times by a nurse or provider, and he was assessed for a variety of ailments, including through blood tests, EKGs, blood pressure checks, and a scheduled colonoscopy. Contrary to Sims' assertion that his medical needs are being ignored, the record here shows that the medical staff are conducting tests to rule out possible causes for Sims' medical concerns and are exercising their medical judgment to determine the proper course of treatment. It is not enough for Sims to argue that they are making the wrong decisions; negligence or medical malpractice is not enough for liability under the Eighth Amendment. *Walker*, 940 F.3d at 965.

Even if some medical care request forms have gone unanswered, the overall healthcare Sims is receiving contradicts his contention that his medical needs are being ignored. Further, even if some prison employees are biased against Sims because of his previous conviction for child molestation (which the Warden denies), there is no

indication that this bias is affecting his medical care. He has not shown a likelihood that the medical professionals' assessments and treatment decision are based on factors other than their medical judgment or are otherwise "blatantly inappropriate." *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.") (quotation marks and citation omitted). Finally, contrary to Sims' belief that he must be pulled out of his cell and assessed every time he complains of chest pain, medical staff are entitled to use their medical judgment to determine whether the situation warrants emergency care. *See Lewis v. McLean*, 941 F.3d 886, 894 (7th Cir. 2019) ("Nurse McLean did not think emergency care was necessary when Mr. Lewis could move his limbs, breathe, and talk; in other words, she exercised her professional judgment. A treatment decision that's based on professional judgment cannot evince deliberate indifference.") (quotation marks and brackets omitted).

Based on the present record, Sims has not demonstrated a likelihood of success in proving that medical staff are acting with deliberate indifference to his medical needs, nor has he demonstrated that he will suffer irreparable injury if he is not granted immediate relief before this case is resolved. He is not entitled to the extraordinary remedy of a preliminary injunction.

For these reasons, the court DENIES the motion (ECF 12).

SO ORDERED on December 18, 2024

/s/JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT