UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JOHN SIMS,

    Plaintiff,

    v.

ORTH, DWAN, GARCIA, WHEELER,
RAGLIN, ROBINSON, MONERPENNY,
FRANCIS,

    Defendants.

Case No. 3:24-CV-672 JD

## <u>OPINION AND ORDER</u>

John Sims is proceeding pro se against several guards and two nurses of the Westville

Correctional Facility: Officers Alan Orth, Francisco Garcia, Dashaun Wheeler, Dean Raglin,

Mark Moneypenny, and Lieutenant Marsha Robinson ("state defendants"); and Nurses Dawn

Schilling and Francis Okechukwu Ekeh ("medical defendants").[1] He is seeking compensatory

and punitive damages on his claim that they were deliberately indifferent to his seizures, strokes,

chest pain, heart attacks, and blood in his stool, starting in January 2024, in violation of the

Eighth Amendment to the United States Constitution. (DE 11 at 7–8.) Both sets of defendants

moved for summary judgment, and the motions are now fully briefed.[2] With their motions, the

defendants provided Mr. Sims the notice required by Northern District of Indiana Local Rule 56-

---

[1] The case caption contains the defendants' partial and sometimes misspelled names. To keep the record accurate, the Court will direct the Clerk to update the caption with the defendants' names as they appear in their motions for summary judgment.

[2] Among the defendants included in the state defendants' motion is Warden Jason Smiley. But Warden Smiley has been long-dismissed from this case and is no longer a party. (*See* DE 87.) Likewise, insofar as the state defendants argue that Mr. Sims is not entitled to injunctive relief, that argument is moot as the same order that dismissed Warden Smiley also dismissed Mr. Sims's claim for injunctive relief. (*See id.*)

1(f). (DE 151, 158.) Included in the notice were copies of Federal Rule of Civil Procedure 56 and Northern District of Indiana Local Rule 56-1.

**(A) Summary Judgment Standard**

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

**(B) Undisputed Material Facts**

All the defendants argue that summary judgment should be granted in their favor because Mr. Sims has failed to show that he had a serious medical need. And even if he did, they contend that they were not deliberately indifferent to that need. The state defendants also argue that they

are entitled to qualified immunity. In his response briefs, Mr. Sims argues repeatedly that he told the defendants that he was suffering from seizures, strokes, chest pain, heart attacks, and blood in his stools, but each of them refused his requests for medical help on the grounds that he was a child molester.

Both the medical and state defendants submitted a statement of undisputed material facts with their respective motions. In response, Mr. Sims submitted his own statements of material fact and his affidavits. He indicates that the statements of material facts contain "specific citations to [his] designated evidence" (DE 160 at 2; 163 at 2), but in reality no such citations exist (*see* DE 161, 164). The medical defendants pick up on that shortcoming and argue that, since Mr. Sims has failed to support his statement of material facts with corresponding evidence, the Court should ignore it.[3] They rely on Northern District of Indiana Local Rule 56-1(b)(2), which requires "a correspondingly numbered response immediately following each paragraph of the Statement of Material Facts" supported with "a citation to evidence supporting each dispute of fact." *Id.*

Mr. Sims filed a sur-reply brief in which he points out that he is proceeding pro se and that he responded to the medical defendants' motion for summary judgment "as best as he can and knows how to." (DE 167 at 2.) Rather than try to correct the deficiency, he merely reasserts his disagreement with the medical defendants' statement of undisputed material facts: "the plaintiff does not agree with none of it." (*Id.*)

The Court agrees with the medical defendants that Mr. Sims's statement of material facts in response to their motion is deficient as it neither corresponds to their statement of undisputed

---

[3] The state defendants make no such procedural argument in their reply brief. Instead, they only invoke the general notion that "summary judgment is the 'put up or shut up time in litigation,'" (DE 162 at 2 (citing *Brown v. CACH LLC*, 94 F.4th 665, 667 (7th Cir. 2024), and contend that Mr. Sims has failed to meet that requirement.

material facts nor cites supporting evidence. *See* N.D. Ind. L.R. 56-1(e) ("The court may find a fact is not supported if the citation does not include a page or paragraph number to evidence in the record which can be presented in an admissible form unless the court may take judicial notice of the fact."). "Although pro se plaintiffs are generally entitled to lenient standards, they are required to comply with local procedural rules governing motions for summary judgment." *Fletcher v. Hoeppner Wagner & Evans*, No. 2:14-CV-231-TLS, 2018 WL 3819239, at *2 (N.D. Ind. Aug. 10, 2018). That said, Mr. Sims's affidavit is very similar to his statement of material facts, and to the extent that it is based on his personal knowledge, the Court will consider it, mindful that he is not represented by counsel. The facts in the affidavit (both affidavits, for that matter) are straightforward enough for the Court to discern what Mr. Sims believes happened and whether he disputes the defendants' account.

With this in mind, what follows is some background on the parties and Mr. Sims's medical treatment history beginning in January 2024, while he was incarcerated at Westville Correctional Facility ("WCF"):

Mr. Sims has a seventh-grade education. He does not have any medical training. (DE 150 at 1.) Mr. Sims was held in the A-Pod of the WCF, which is a restrictive housing unit, from December 2023 until August 2024. (*Id*.) He was 33 years old at the time. (DE 156-3 at 67.) Mr. Sims's cell was locked at all times. (DE 161 at 7.)

Alan Orth, Francisco Garcia, Dashaun Wheeler, Dean Raglin, and Mark Moneypenny were correctional officers at the facility, and Marsha Robinson was a correctional lieutenant, while Mr. Sims was incarcerated there. (DE 150 at 1–2.) None of them have advanced medical training. (*Id*. at 9.)

Nurse Dawn Schilling was employed at WCF as the Director of Nursing. She maintained both administrative and clinical duties. From May through August 2024, Nurse Schilling was primarily assigned to the Westville Control Unit where the A-Pod is located. She passed out medications frequently during that time, including to Mr. Sims. (DE 156 at 6.)

Francis Okechukwu Ekeh was employed at WCF as a registered nurse. Nurse Ekeh did not direct patient treatment, diagnose patients, or prescribe medications. His job was to assess patients, contact the health care provider, if necessary, and follow the provider's treatment orders. (*Id.* at 1.) One of Nurse Ekeh's duties was to pass out medications to the inmates, including Mr. Sims, which typically took up the entire shift. (*Id*. at 2.)

When passing out medication, Nurse Schilling and Nurse Ekeh do not speak to inmates and address their medical concerns only if they require immediate or emergency medical treatment. (*Id.* at 2, 7–8.) Otherwise, the inmates are advised to fill out a health care request form ("HCRF"). This practice ensures that the nurses pass out all medications to the prisoners on time. (*Id*.)

Upon his transfer to WCF on December 19, 2023, Mr. Sims reported high blood pressure, a psychiatric disorder, and bloody stools. (DE 156 at 11.) While housed in the A-Pod, Mr. Sims was seen weekly for rounds concerning his mental health. He also had monthly mental health visits. (DE 150 at 2.) Mr. Sims received chronic care, including daily medication, for high blood pressure.

On January 4, 2024, Mr. Sims submitted blood, urine, and stool samples for his lab tests. (*Id*.)

The notes from the chronic care visit on January 9, 2024, state that Mr. Sims was prescribed medications, was doing well, and had no complaints. He had reported abdominal pain

a week earlier, and labs were drawn but they came back normal. Mr. Sims was "negative" for respiratory, cardio, and gastrointestinal issues, and the rest of his physical exam was normal. His blood pressure was under control, and the plan was to continue his present management with a follow-up in six months. (DE 150 at 2.)

Just over a month later, on February 15, 2024, Mr. Sims was seen by a nurse for a complaint of "little bumps" on his chest. He reported that he had bumps for three years. The bumps did not hurt or itch and did not show any signs of infection. He was prescribed topical cream. (*Id.*)

On February 27, Mr. Sims submitted two HCRFs, one stating that he needed to be checked for a brain tumor because he had headaches, and the other asking to be checked for blood clots because his body had been hurting and he had been having intermittent chest pain. (DE 156 at 12.) Nurse Schilling responded to the requests by noting that labs were ordered. (DE 156-3 at 20–21.)

On February 28, 2024, Mr. Sims had an electrocardiogram test which was normal. (DE 150 at 3.)

On March 8, 2024, Mr. Sims was seen by Nurse Schilling in response to his February 27 HCRF concerning his brain tumor and blood clotting complaints. Mr. Sims reported no pain, his lungs were clear, and he had no swelling or shortness of breath. Nurse Schilling reported her findings to a nurse practitioner who ordered various blood tests. (*Id.* at 3–4; DE 34-8 at 1–3.)

On March 17, Mr. Sims submitted an HCRF stating that his back was hurting and his heart had been beating fast for the previous five days, and he believed he might be having a heart attack or stroke. (DE 156 at 12.)

On March 19, 2024, Mr. Sims was seen by Nurse Schilling in response to his HCRF two days earlier. Mr. Sims walked in without a limp and no deformities were noted. Mr. Sims stated that he had back pain and requested Tylenol for the pain, which was prescribed for the next fourteen days. (DE 156 at 13; DE 150 at 4.)

He was seen again on March 25, 2024, by Amanda Chalk, LPN, after complaining of back pains when taking his medication and of chest pain. Mr. Sims's vital signs were within normal limits, he was not in acute distress, and there were no signs of respiratory distress. His lungs were clear and his heart sounded normal; the EKG was also normal. Mr. Sims denied squeezing or radiating pain, or numbness in his jaw or shoulders, stating that his pain was mostly in his back, not his chest. Mr. Sims was instructed to contact medical staff if symptoms recurred. (DE 150 at 12; DE 156 at 13; DE 156-3 at 32.)

On April 9, 2024, Mr. Sims was seen by a nurse after complaining about swelling to his feet and ankles. His vitals were within normal limits; he denied chest pain, dizziness, and headaches. He was advised to lower his salt intake. (DE 150 at 4.)

On April 18, 2024, Mr. Sims was seen for a wellness check. He reported that he was assaulted recently by custody staff. No visible injuries were observed, and Mr. Sims stated that he was not in pain and denied any need for immediate medical interventions. (*Id.* at 5.)

A month later, on May 21, 2024, Mr. Sims was seen by a nurse after complaining about being dizzy and lightheaded when he stands up or sits up. The visit summary states that his orthostatic blood pressure was checked and found to be normal. He was educated on stretching to help with back pain. Mr. Sims told the nurse that he had not been seen by a medical care provider since arriving at the facility. (*Id.*)

A month and a half later, on July 8, 2024, Mr. Sims submitted an HCRF regarding feelings of depression and anxiety after a flood in his cell the day before. Mr. Sims saw Nurse Schilling the same day. Mr. Sims said he was feeling fine by then, denied shortness of breath, and denied chest pain. Nurse Schilling educated him on breathing and meditating and informed him to report "right away" if he had anxiety symptoms again. (DE 156 at 14; DE 156-3 at 50–51.)

On July 15, 2024, Mr. Sims was seen in his cell by Heather McAllister, LPN, for complaints of being dizzy and lightheaded; he also stated that he had a seizure. She reported that he had no distress, vital signs were within normal limits, there was no history of seizure and no one witnessed the seizure. She noted he wasn't pale, didn't appear in distress, and was alert, oriented, and able to walk. A lab blood draw was ordered. (DE 150 at 5–6.)

On July 30, 2024, Mr. Sims had another chronic care visit. His physical exam was normal, although Mr. Sims reported dizziness and blood when wiping. His recent labs indicated anemia. The doctor ordered a colonoscopy with an outside provider and noted that he would follow up after the procedure. (DE 150 at 6; DE 156 at 15.)

On August 8, 2024, Mr. Sims was transferred to the D-Pod of the Westville control unit. After that time, he did not encounter any of the defendants except for Officer Garcia. (*Id*.)

On October 1, 2024, Mr. Sims was seen by medical staff for several complaints, including swelling to ankles and feet, rib pain, bumps on chest, constipation, and blood in stool. Mr. Sims also reported that he wakes up on the floor occasionally and is confused about how he got there but denied incontinence or injuries upon awakening. Mr. Sims reported that the bumps on his chest had been there for years. The bumps had no head on them, there was no drainage, and they did not hurt or itch. Mr. Sims was returned to his cell in stable condition. (*Id*.)

8

Just over a month later, on November 8, 2024, Nurse Katie Jacobs evaluated Mr. Sims for complaints of possible seizures. He said he sometimes wakes up on the floor and feels groggy. He reported a family history of seizures. Nurse Jacobs contacted the medical care provider. (*Id*.)

On November 27, 2024, LPN Paula Rogers evaluated Mr. Sims for complaints of nausea, vomiting, and diarrhea. LPN Rogers provided Tylenol, loperamide, and Zofran and advised Mr. Sims to increase fluids, rest, and avoid spicy foods until symptoms subsided. (*Id*. at 6–7.)

Four days later, on December 1, 2024, Nurse Dawn Schilling evaluated Mr. Sims who complained of urinating blood. Nurse Schilling obtained a urine sample, which was yellow and clear. She emailed Dr. Jackson and encouraged Mr. Sims to stay hydrated. (*Id*. at 7.)

On December 12, 2024, Mr. Sims was transported off-site for his colonoscopy. Upon return to the facility, he did not express any further needs or complaints and was escorted back to his cell in stable condition. (*Id*.)

On December 31, 2024, Dr. Liaw followed up with Mr. Sims about his colonoscopy report, noting that return paperwork did not list any follow-up recommendations. Also, in response to Mr. Sims's reports that he had suffered seizures over the last eight months, Dr. Liaw prescribed medication against seizures, although he did not explain his reasoning.[4] (DE 156-3 at 67; DE 161 at 6.)

On March 5, 2025, Mr. Sims was transferred to Putnamville Correctional Facility.

**(C) Discussion**

**(1) *Eighth Amendment Standard for Medical Care***

---

[4] Dr. Liaw's medical summary of the visit has only a vague reference to the prescription:, "a – seizure vs pseudoseizure[;] p – start keppra q PM and fu in 6 months." (DE 156-3 at 67.) It does not appear that any testing was conducted before or after the visit.

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "An objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (quoting *Zentmyer v. Kendall Cnty.*, 220 F.3d 805, 810 (7th Cir. 2000)). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). According to the Seventh Circuit, serious medical need includes "'the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)).

"Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)); *see also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate-indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he

10

could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005); *see also*

*Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (the defendants "must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists and must

also draw the inference.") (quotation marks omitted). "Additionally, 'a factfinder may conclude

that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"

*Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 842). Finally,

deliberate indifference "includes intentionally denying or delaying access to medical care or

intentionally interfering with prescribed treatment." *Rodriguez v. Plymouth Ambulance Serv.*,

577 F.3d 816, 829 (7th Cir. 2009).

For a medical professional to be held liable for deliberate indifference to an inmate's

medical needs, she must make a decision that represents "such a substantial departure from

accepted professional judgment, practice, or standards, as to demonstrate that the person

responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d

688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to
> prisoners, but rather they must provide medical treatment that reflects
> professional judgment, practice, or standards. There is not one proper way to
> practice medicine in a prison, but rather a range of acceptable courses based on
> prevailing standards in the field. A medical professional's treatment decisions will
> be accorded deference unless no minimally competent professional would have so
> responded under those circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to

deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the

"best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendant

has provided some level of care for a prisoner's medical condition, in order to establish

deliberate indifference the prisoner must show that "the defendants' responses to [his condition]

were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

"A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009). Thus, if a prisoner is under the care of medical experts, "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *see also Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (a non-medical professional is entitled to "rely on the expertise of medical personnel"). This protection applies unless the non-medical defendant has "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

The Court "must examine the defendants' knowledge and actions individually." *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010).

### (2) *Mr. Sims's Medical Needs*

According to Mr. Sims, he complained to the defendants about having seizures, a stroke, a heart attack, chest pain, and blood in his stools. Both the medical and state defendants argue that, despite his complaints, there is no evidence that he actually suffered these conditions, and, at best, he offers his own self-diagnosis as evidence, which he is unqualified to do. The defendants thus contend that Mr. Sims has not shown that he suffered an objectively serious medical need. The state defendants add that Mr. Sims actually mistook the symptoms of anxiety

and panic attacks for a stroke and heart attack, which they contend further demonstrates that he did not have a serious medical need. (DE 149 at 4–5.)

As a first step to establishing liability under the Eighth Amendment, Mr. Sims must provide evidence that he suffered from an objectively serious medical need. He has failed to do so as to the first four of the five medical conditions he complained of. As to the last one—blood in his stools—to the extent that it constitutes an objectively serious medical need, Mr. Sims has provided no evidence that this condition wasn't addressed, as discussed in the next section. Moreover, the evidence about his complaints about blood in his stools is too vague and generic to hold the defendants liable.

Again, "[a]n objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *King*, 680 F.3d 1013, 1018 (7th Cir. 2012) (quoting *Zentmyer*, 220 F.3d at 810 (7th Cir. 2000)). Mr. Sims's evidence suggests that he first complained to the defendants about chest pain and difficulty breathing on March 18, 2024. Then, on April 1 and 2, he complained of chest pain and of having had a seizure. In mid-June, he complained of chest pain, difficulty breathing, and seizures. Finally, on August 1, he complained of a stroke and chest pain. But there's no evidence that, during this timeframe—from his arrival to WCF on December 19, 2023, until he was transferred to the D-Pod on August 8, 2024, and out of the care of these defendants—any physician or other medical provider diagnosed Mr. Sims having suffered a seizure, stroke, heart attack, or chest pains that mandated treatment. Nor do any of his many medical tests and evaluations during that time period confirm he had an objectively serious medical need.

Equally absent is any evidence that his ailments were so serious or obvious that anyone should have readily recognized the need for immediate attention. After all, when complaining of his medical conditions to the defendants, he merely claimed he had a condition without describing any symptoms or demonstrating any outward signs of the condition. While a person need not be a doctor to recognize when someone is currently experiencing a stroke, heart attack, or seizure, the same is not true when someone merely claims they had previously suffered such an event without exhibiting any signs of such a condition. And here, the undisputed evidence shows that there were no signs from which someone could infer the need for a doctor's attention. When reporting that he had suffered a stroke, Mr. Sims had no difficulty speaking or moving parts of his body; he was not slurring words and did not have a drooping face. Similarly, when complaining of a heart attack, he did not exhibit chest pain radiating to his arms, jaw, or back, or pain worsened by exertion, or vomiting. Finally, there's no evidence that Mr. Sims was showing or relating any signs of having suffered a seizure from which the need for a doctor could be inferred. *See e.g.*, Mayo Clinic: Seizures, https://www.mayoclinic.org/diseases-conditions/seizure/symptoms-causes/syc-20365711 (last visited July 14, 2026) (describing possible post-seizure symptoms, including slow response, trouble with memory, trouble talking or writing, feeling sleepy, confused, dizzy sad, scared, anxious, or frustrated, feeling nausea, a headache, or weakness). In short, no reasonable jury could find from the evidence provided by Mr. Sims that his complaints of a stroke, heart attack, and seizure amounted to objectively serious medical needs.

The same is true of his complaints of chest pain accompanied by difficulty breathing. As submitted, the evidence does not establish that Mr. Sims's condition was so obvious that the need for a doctor's attention was easily recognizable. Here, there was no evidence of persistent

chest pressure, radiating pain, or other signs of acute distress. While the presented symptoms might suggest discomfort, without more, they do not establish that Mr. Sims suffered from an objectively serious medical need. *See Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) ("[T]he injuries of which Henderson complains—breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy—are, objectively speaking, relatively minor.").

Moreover, the uncontested medical records demonstrate that Mr. Sims regularly received medical care; he was allowed to go for medical visits whenever he submitted an HCRF. And the results of those visits were inconsistent with the conditions presented to the defendants. Moreover, these inconsistencies are underscored by the extensive medical record—the many medical visits and tests conducted by medical staff—the accuracy of which Mr. Sims does not dispute. Over a period of seven months, while Mr. Sims was under the supervision of the defendants, he was seen fourteen times by the medical care providers. Often his visit notes reflect the same or related concerns as what he reported to the defendants. Sometimes he had no related complaints. Yet in every instance, his blood pressure was controlled, his vital signs were normal, his EKGs were unremarkable, his lab results were within normal limits, he exhibited no distress, and he denied squeezing or radiating pain, or jaw or shoulder numbness. (*See* DE 150 at 2 (Jan. 9 med. visit); DE 150 at 3 (Feb. 2 med. visit); DE 156 at 13 (March 25 med. visit); DE 150 at 4 (April 9 med. visit); DE 150 at 5 (April 18 med. visit); DE 156 at 14 (July 8 med. visit); DE 150 at 5–6 (July 15 med. visit); DE 150 at 6 (July 30 med. visit).) And even when his complaint of seizure was considered by LPN McAllister on July 15, 2024, during the cell-front visit, despite medical observation and subsequent testing, there was no confirmation of his complaint. In light of this medical record, Mr. Sims's self-diagnoses, absent more, are insufficient to establish the existence of a serious medical condition. *See Ellis v. Bailey*, No.

1:21-CV-2383, 2024 WL 518138, at *9 ("Mr. Ellis' self-diagnosis of a heart condition is insufficient given the repeated examinations and diagnostic testing conducted by both nurses and doctors that revealed no such condition.") (citing *Jackson v. Anderson*, 770 F. App'x 291 (7th Cir. 2019) (affirming grant of summary judgment because although the plaintiff told nurses that he possibly suffered a broken facial bone, "they were not required to adopt his diagnosis or demands for an x-ray once they ruled out any signs of a broken bone from their own examinations"); and *Green v. Senkowski*, 100 F. App'x 45, 47 (2d Cir. 2004) (affirming grant of summary judgment where plaintiff offered nothing more than his own self-diagnosis that was "unsupported by any medical evidence in the record" and his doctor had concluded that his complaints of wrist pain were "the product of a 'psychosomatic delusion'")).

On the other hand, Mr. Sims's allegation of blood in his stools could constitute a serious medical need. A person would readily recognize the need for medical intervention as such symptoms, especially if persistent, could signal serious medical conditions, including colon cancer. As a result, the Court will proceed to consider the subjective prong, namely, whether the defendants knew that Mr. Sims had blood in his stools and disregarded a substantial risk of serious harm. At the same time, even though Mr. Sims has failed to establish that his claims of having had a heart attack, stroke, seizures and experiencing chest pain were objectively serious medical needs, the Court will also address these conditions for the sake of completeness.

### (3) *Deliberate Indifference*

(a) *Medical Defendants*

Mr. Sims claims that Nurse Schilling and Nurse Ekeh violated his Eighth Amendment rights by refusing to provide medical treatment for his serious medical needs. Concerning Nurse

Schilling, Mr. Sims states that, on June 11, 2024, he told her that he was experiencing chest pain and had difficulty breathing. At that point, Officer Garcia told her not to help him because he was a child molester, so she refused to address his chest pain. (DE 163-2 at 2.) Three days later, on June 14, Mr. Sims told Nurse Schilling that he had a seizure and didn't feel right and needed to be seen by medical staff, but she refused, telling him that he was a child molester and needed to die. (*Id.*) The next day, on June 15, Mr. Sims told Nurse Schilling that he was still having seizures and chest pain and needed to be seen but she still refused to help him. (*Id.*) Finally, on August 1, Mr. Sims told Nurse Schilling that he had a stroke in his cell and did not feel right and that his chest was hurting, but she would not attend to him, again telling him that "he's a child molester and that's what he gets." (*Id.*) According to Mr. Sims, no one witnessed his health emergencies because he was locked in the cell at all times and the guards would not always be around to regularly check on the inmates. Mr. Sims submits that he was prescribed medication against seizures in December 2024, several months after his transfer to the D-Pod and away from the defendants, after which his seizures ceased.

Mr. Sims also claims generally that Nurse Schilling refused to treat him from May until August 2024 "for seizures, strokes, heart attacks and chest pain which are all medical emergency because he was a child molester and because Defendant Officer Garcia told her to." (DE 163-2 at 2.) He further states that he once submitted a health request form and was seen by Nurse Schilling (he does not say what the health request was for or when) but her assessment was superficial.

Mr. Sims makes similar allegations against Nurse Ekeh, although he pinpoints only two specific incidents. He states that, on March 18, 2024, he told Nurse Ekeh that he was having chest pain and it was hard for him to breath but Nurse Ekeh refused to provide any care, saying

17

that he didn't like child molesters and walked away. Then, several weeks later, on April 1, Mr. Sims complained to Nurse Ekeh that he just had a seizure, but nurse Ekeh again refused to provide any medical care, telling him that "you should [have] thought about what you did before you molest that girl" and left him. (DE 163-2 at 3–4.) As with Nurse Schilling, Mr. Sims also adds generically that, during the time that he was held in the A-Pod, Nurse Ekeh refused medical treatment for his seizures, strokes, heart attacks, chest pain, and blood in his stool because Mr. Sims was a child molester.

In their statement of material facts, the medical defendants agree that Nurse Schilling and Nurse Ekeh passed out medications to Mr. Sims during this period. At the same time, they state that they did not know that Mr. Sims was a child molester nor why he was incarcerated. In any case, the medical defendants submit that they treat all their patients the same, regardless of their past circumstances. They contend that they never told Mr. Sims that they would not treat him because he was a child molester. (*Id.* at 7.) According to the medical defendants, Nurse Schilling did not withhold treatment from Mr. Sims as she knew nothing about his seizures, strokes, heart attacks, chest pain, and blood in his stool, and she had no reason to believe that he experienced any such maladies. (DE 156 at 5, 7.) They say that Mr. Sims often stopped them during medication pass, complaining of the things mentioned, but he could not have been suffering those conditions because he was always calm, able to speak, and not in medical distress. (DE 156 at 5, 8.) The medical defendants submit that a patient experiencing a stroke or who has experienced a stroke, would show outward signs like difficulty speaking or moving parts of his body, facial droop, and so on. According to the medical defendants, Mr. Sims did not present any such signs. (*Id.* at 8.) Nurse Schilling likewise saw no evidence of heart attacks. (*Id.* at 10.) According to the medical defendants, heart attacks and strokes can present with symptoms

18

similar to those of panic attacks, including chest pain or discomfort, shortness of breath, rapid heartbeat, and Nurse Schilling's clinical and professional opinion was that "one or more of Mr. Sims's perceived medical conditions are likely attributable to panic attacks." (*Id*. at 10.) Likewise, the medical defendants point out that "pseudo-seizures" can be caused by psychological or stress-related processes as opposed to abnormal electrical brain activity, such as epileptic seizures. (*Id.* at 11.)

While Nurse Schilling and Nurse Ekeh sharply contradict Mr. Sims's claims, the Court does not weigh evidence or make credibility determinations at summary judgment. Instead, it must credit Mr. Sims's version of the disputed facts if they are supported by the evidence. Therefore, the Court must conclude for purposes of this motion that Nurse Schilling and Nurse Ekeh told Mr. Sims that they would not treat him for his complaints because he was a child molester. But missing from Mr. Sims's factual submissions is any evidence that he in fact needed immediate treatment. After all, the uncontested evidence from the medical defendants is that, when Mr. Sims made his medical complaints, he did not present with any symptoms corresponding to his complaints. While Mr. Sims may have been displeased with the nurses' alleged comments, there is nothing to suggest that he required immediate attention or did not otherwise receive appropriate medical care given his many visits with medical staff, and that their conduct therefore reflects "a substantial departure from accepted professional judgment, practice, or standards." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *see also Robertson v. Liedtke*, No. 3:23-CV-514-HAB, 2026 WL 274603, at *4-5 (N.D. Ind. Feb. 2, 2026) (prison nurse not deliberately indifferent for declining to stop medication pass to provide immediate medical care for prisoner's non-emergency conditions, as prisoner was able to request medical attention through the normal procedures).

More importantly, "in deciding whether the defendants were deliberately indifferent to [the plaintiff's] medical needs, it's appropriate to 'examine the totality of an inmate's care when considering whether that care evinces deliberate indifference. . . .'" *Swann v. Brubaker*, No. 3:14-CV-1889 RM, 2016 U.S. Dist. LEXIS 7967, at *11–12 (N.D. Ind. Jan. 25, 2016) (quoting *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999)). Here, the undisputed evidence of Mr. Sims's many medical visits shows that, despite the nurses' refusal to immediately treat him, Mr. Sims still received appropriate medical care. It is uncontroverted that Mr. Sims frequently submitted an HCRF. In fact, Nurse Schilling responded several times to Mr. Sims's HCRFs and assessed him in person. On February 27, Mr. Sims submitted two HCRFs, seeking to be checked for a brain tumor because he had headaches, and seeking to be checked for blood clots because his body had been hurting and he had been having intermittent chest pain. (DE 156 at 12.) Nurse Schilling responded to the requests by noting that labs were ordered. (DE 156-3 at 20–21.) She also evaluated Mr. Sims on March 8. During the visit, Mr. Sims reported no pain, his lungs were clear, and he had no swelling or shortness of breath. Nurse Schilling reported her findings to the nurse practitioner, who ordered various blood tests. (DE 150 at 3–4; DE 34-8 at 1–3.)

Ten days later, on March 19, 2024, Mr. Sims was seen by Nurse Schilling again in response to his HCRF two days earlier, in which he complained of back pain and fast heartbeat over the previous five days. He was concerned that he may be experiencing a heart attack or stroke. Nurse Schilling noted that Mr. Sims was walking without a limp and his circulation, movement, and sensation were good. Nurse Schilling requested that a doctor prescribe Tylenol which he did. (DE 156 at 13; DE 150 at 4.)

Six days later, on March 25, Nurse Chalk saw Mr. Sims for complaints of chest pain, but his physical findings and EKG were normal. On April 9, Nurse Jacobs saw Mr. Sims for

20

swelling in his ankles but his vital signs were normal and he was advised to lower his salt intake.[5] Less than two weeks later, he underwent a wellness check after reporting an assault by custody staff, but Mr. Sims denied pain or the need for immediate medical intervention. On May 21, Nurse Jacobs saw Mr. Sims for complaints of dizziness and lightheadedness and back pain but his vital signs were normal and he was taught how to stretch in response to the back pain.

On July 8, Mr. Sims reported having a panic attack the day before, and Nurse Schilling assessed him that same day, noting that by then he was feeling fine and had a normal exam, with no shortness of breath or chest pain. Nurse Schilling taught him breathing and meditation exercises and notified the doctor.

Mr. Sims's medical care continued following his complaints of seizure in June. In fact, on July 15, Heather McAllister, LPN, saw him at his cell after he complained of dizziness, lightheadedness, and an unwitnessed seizure. LPN McAllister observed no acute distress. His vital signs were within normal limits, he wasn't pale, he didn't appear in distress, and he was alert, oriented, and able to walk. LPN McAllister ordered blood tests. (DE 150 at 5–6.)

On July 30, Dr. Liaw saw Mr. Sims for his chronic care related to his high blood pressure. Dr. Liaw noted that Mr. Sims's blood pressure was normal, but he was anemic. He observed a recent call for lightheadedness and dizziness. Mr. Sims reported blood when wiping but said nothing about chest pain, difficulty breathing, or seizure. His physical exam was normal in all respects, including his respiratory and cardiovascular functions.

---

[5] According to Nurse Schilling, "[t]his condition . . . is often a symptom of hypertension, for which Mr. Sims had a diagnosis and was already being treated with medication." (DE 156-1 at 4.)

21

Mr. Sims does not claim or argue in any way that this medical treatment constitutes a substantial departure from proper medical care. On August 8, Mr. Sims was transferred out of the A-Pod, and was no longer under the care of the medical defendants.

In light of this undisputed evidence, Mr. Sims has not demonstrated that Nurse Schilling and Nurse Ekeh abandoned him in the face of a serious medical need. Although he contends that he was entitled to immediate care for his reported seizures, heart attack, stroke, and chest pain, he has not established that he experienced an actual medical emergency. Furthermore, the undisputed evidence shows that he received continuous care throughout his time in the A-Pod.

By the same token, Mr. Sims has not shown that his medical care was so delayed that it rises to the level of a constitutional violation. Mr. Sims submits that he would have been treated with anti-seizure medication sooner than December 31, had the medical defendants not refused to treat his seizures when he reported them. (DE 163-1 at 3.) But he was evaluated and examined for his complaint of a seizure on July 15 with no indication that he was in need of treatment. LPN McAllister noted that Mr. Sims stated that he had a seizure, but no one witnessed it, and he had no history of seizures. He also complained of high blood pressure. (DE 156-3 at 53.) LPN McAllister further noted that Mr. Sims did not appear pale or in acute distress, and his vital signs were within normal limits. Although she ordered blood labs, she did not schedule a follow-up visit, and limited her recommendations to reducing salt and calorie intake, and exercising. (DE 156-3 at 52–53.) Moreover, neither Mr. Sims nor the medical record provides much insight explaining why he was prescribed seizure medication on December 31, more than four months after his transfer from the D-Pod. Yet an inmate who complains that a delay in medical treatment rose to a constitutional violation must "provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties v. Carter*, 836 F.3d 722, 730–731(7th Cir.

22

2016) (en banc). Mr. Sims provided no such evidence or arguments. Apart from remarking that he began receiving anti-seizure medication in December 2024, he provides no evidence from which a reasonable jury could infer that the medical defendants knew, at the time he requested care, that failing to provide it would pose a substantial risk of serious harm. He submits no medical documents suggesting that his care was unreasonably delayed, that the medical defendants departed from accepted medical standards, or that they acknowledged in their testimony that they failed to provide necessary treatment. Also, "whether the length of delay is tolerable depends on the seriousness of the condition and the ease or providing treatment," *id.* at 730, but as discussed already, Mr. Sims has not shown that his condition was serious enough to warrant immediate treatment. Nor has Mr. Sims shown that the nurses are responsible for any delay in his care to begin with. After all, although he first complained about having a seizure on June 1 and then again mid-June, he had three medical appointments during that interval (April 9, 18, and May 21), and four more after that (July 8, 15, 30, and August 1), which were ample opportunity to express his concerns to medical staff. Accordingly, Mr. Sims has no basis on which to insist that his medical care was delayed in violation of the Eighth Amendment.

Moreover, Mr. Sims's allegations concerning blood in his stool were properly addressed by the medical defendants. Mr. Sims does not indicate when he first apprised either Nurse Schilling or Nurse Ekeh that there was blood in his stool. The medical record indicates that his first complaint to medical staff of blood in his stool was at a chronic care visit on July 30, 2024. Dr. Liaw immediately referred Mr. Sims for a colonoscopy. At that point, any obligation that Nurse Schilling or Nurse Ekeh had to report the condition was satisfied. Without some indication about the timing and specifics of what Mr. Sims told the medical defendants, the Court cannot conclude that the Eighth Amendment was implicated. *Gabrielle M. v. Park Forest-Chi. Heights*

*Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("It is well established that in order to withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations").

Likewise, Mr. Sims has provided no evidence supporting his assertion that Nurse Schilling merely pretended to evaluate him at a health care visit because Officer Garcia instructed her to do so. The date of the visit is unspecified as is the condition for which Mr. Sims sought treatment. Beyond this conclusory allegation, Mr. Sims offers no evidence regarding the visit itself, how he knows that Officer Garcia directed Nurse Schilling to forgo a genuine evaluation, or whether Nurse Schilling followed any such directive. Accordingly, no reasonable jury could find that this episode constituted deliberate indifference to a serious medical need.

(b) *State Defendants*

In their motion for summary judgment, the state defendants submit that none of them were ever contacted by Mr. Sims concerning any medical issues.[6] In opposing the motion, Mr. Sims contends that he told each of them that he was suffering from seizures, strokes, chest pain, heart attacks, and blood in his stools, but they refused to help or inform the medical staff of his ailments.

The Court need not conduct a separate analysis for the objective element of the Eighth Amendment test. Mr. Sims essentially avers the same facts in relation to the state defendants as he did against the medical defendants, so the Court reaches the same conclusion. Apart from his allegations that he had blood in his stools, Mr. Sims has not provided evidence that he

---

[6] Without getting into the substance of footnote 1 of the state defendants' brief, which they describe as "worth noting" (Defs.' Br., DE 149 at 1 n.1), the Court observes that the footnote is a gratuitous aside that serves no apparent purpose.

experienced objectively serious medical needs. But even assuming that he has, he lacks evidence establishing that the state defendants acted with deliberate indifference to any such needs.

The Court begins with Mr. Sims's claims against Officers Orth, Raglin, Moneypenny, and Lt. Robinson. The Court finds that Mr. Sims has failed to point to evidence that these officers acted with deliberate indifference to his serious medical need. Mr. Sims offers only generalized assertions that lack the details to create a genuine dispute of material fact in relation to these defendants. For example, as to each of these defendants Mr. Sims avers only that, from December 2023 through August 2024, he complained to them of chest pain, seizures, strokes, heart attack, and "other medical issues," but they failed to notify the medical staff because he was a child molester. (DE 161 at 4–5.) Within this nine-month period, he identifies no specific instances, or any other particularities, of what he did to let the state defendants know of his medical condition. He does not explain the circumstances of his encounters and does not explain what exactly he told them. Also, Mr. Sims provided no evidence that he told any of the guards, including Officers Wheeler and Garcia, about blood in his stools. He says nothing about that in his affidavit and his "statement of material facts" contains only a conclusory reference: "the Defendant(s) in this complaint was deliberate indifference to the Plaintiff's medical issues like stroke, seizures, chest pain, blood in stool and other medical issue because he was a child molester." (DE 161 at 7 (text as in original).) In fact, Mr. Sims does not even mention blood in his stools in his brief opposing the state defendant's motion for summary judgment. Mr. Sims's vague allegations aren't enough to defeat summary judgment for Officers Orth, Raglin, Moneypenny, and Lt. Robinson.[7] *See Gabrielle M. v. Park Forest-Chi. Heights Sch. Dist. 163*,

---

[7] To the extent that Mr. Sims attempts to hold Lt. Robinson liable on account of her supervisory role at the prison, there is no general *respondeat superior* liability under 42 U.S.C. § 1983. *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009). A supervisor can be liable for the conduct of the subordinates only if she is personally involved

315 F.3d 817, 822 (7th Cir. 2003) ("It is well established that in order to withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations"); *Sommerfield v. City of Chi.*, 863 F.3d 645, 649 (7th Cir. 2017) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough") (quotation marks, brackets, and citation omitted).

Importantly, Officers Orth, Raglin, Moneypenny, and Lt. Robinson submitted evidence that they were relying on the judgment of medical staff for Mr. Sims's medical treatments, and Mr. Sims has submitted no evidence that they knew or should have known that medical staff failed to appropriately treat him. *See King*, 680 F.3d at 1018 (guards may rely on the expertise of medical staff unless they have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner."). In fact, Mr. Sims does not even contend that the medical treatment he did receive was inappropriate. Moreover, regardless of their motive for not acting—whether because Mr. Sims is a "child molester" or because they relied on medical staff—the guards cannot be held liable since there was no "substantial risk of harm" to Mr. Sims given the regular medical treatment he received. And there is nothing to suggest that the medical treatment that Mr. Sims received over a relatively short period of time was "so blatantly inappropriate as to evidence intentional mistreatment." *Greeno*, 414 F.3d at 654. Said another way, knowing that Mr. Sims was in the regular care of the medical staff, it cannot be said that the guards acted with a "sufficiently culpable state of mind" in not providing him care. *Farmer*, 511 U.S. at 834; *see also Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018) ("When detainees are under the care of medical experts, non-medical jail staff may

---

in that conduct. "Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001).

generally trust the professionals to provide appropriate medical attention. We will not find a jail official to have acted with deliberate indifference if she reasonably relied on the judgment of medical personnel." (citations omitted)). Moreover, Mr. Sims has provided no evidence that the state defendants under consideration (Officers Orth, Raglin, Moneypenny, and Lt. Robinson) interfered with Mr. Sims submitting HCRFs or otherwise prevented him from attending his health care appointments. Therefore, summary judgment will be entered in their favor.

Next, although Mr. Sims has provided more detailed accounts of his interactions with Officers Wheeler and Garcia, he has not shown that their reliance on the medical staff for his care does not protect them from liability. In his statement of material facts, Mr. Sims represents that, on April 1, 2024, he told Officer Wheeler and Nurse Ekeh that he was having chest pain to which Officer Wheeler responded that child molesters don't get medical treatment and refused to inform medical staff about his condition. (DE 161 at 2.) Then again, at 3:05 a.m. the next day, Mr. Sims told Officer Wheeler that he just had a seizure and needed medical help, but Officer Wheeler told him that he would not help because Mr. Sims was a child molester. (*Id.*)

Similarly, Mr. Sims maintains that Officer Garcia not only refused to inform the medical staff of his seizures and chest pain and difficulty breathing on June 5, 6, 11, 14–16, 19, and 29, but he also encouraged Nurse Schilling on June 11 to forgo any care for Mr. Sims because he was a child molester. (161 at 2–4.)

Like the other state defendants, Officers Wheeler and Garcia contend they were justified in ignoring Mr. Sims's complaints because they were relying on the medical staff for his health care. A prison officer is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health." *Farmer*, 511 U.S. at 837. Accepting Mr. Sims's facts concerning his interactions with Officers Wheeler and Garcia as true, the evidence does not show that either

27

officer was deliberately indifferent to Mr. Sims's serious medical needs. Although the Court must accept at this stage Mr. Sims' allegations that the officers encouraged the nurses not to treat Mr. Sims when he requested medical attention because he is a child molester, Mr. Sims has not shown, for the reasons discussed above, that he was entitled to immediate treatment in the first place for his complaints of a heart attack, seizure, and chest pain. Likewise, Mr. Sims has not shown that Officers Wheeler and Garcia interfered with his HCRF submissions, or the subsequent scheduling of medical visits, or the passing out of daily medications. Moreover, since Mr. Sims was under the frequent care of medical experts—given his numerous visits with medical staff—there is no evidence that Officers Wheeler and Garcia knew of a substantial risk to his health based on the information provided by Mr. Sims on those occasions. Once again, regardless of their statements to Mr. Sims or their motive for not acting, given their knowledge of his regular medical care and the absence of any alleged knowledge that the medical care received was inadequate, it cannot be said that they acted with a "sufficiently culpable state of mind." "'If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison.'" *Greeno*, 414 F.3d at 656 (quoting *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004)). Mr. Sims could overcome this presumption only by showing that Officers Wheeler and Garcia had "'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *King*, 680 F.3d at 1018 (quoting *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008)). Yet he submitted no evidence to that effect. Given Officer Wheeler's and Officer Garcia's reliance on the expertise of WCF's medical staff to treat Mr. Sims, no reasonable jury could conclude they violated Mr. Sims's

28

Eighth Amendment rights. Therefore, summary judgment is warranted in favor of Officers Wheeler and Garcia.

**(D)  Conclusion**

For these reasons the Court—

- GRANTS the state defendants' motion for summary judgment (DE 148);

- GRANTS the medical defendants' motion for summary judgment (DE 155);

- DIRECTS the Clerk to update the caption as follows:

  o  "Orth" must be replaced with "Alan Orth";

  o   "Garcia" must be replaced with "Francisco Garcia";

  o  "Wheeler" must be replaced with "Dashaun Wheeler";

  o  "Dwan" must be replaced with "Dawn Schilling";

  o  "Raglin" must be replaced with "Dean Raglin";

  o  "Robinson" must be replaced with "Marsha Robinson";

  o  "Monerpenny" must be replaced with "Mark Moneypenny";

  o  "Francis" must be replaced with "Francis Okechukwu Ekeh"; and

- DIRECTS the Clerk to enter judgment for all the defendants and against John Sims, and to close this case.

SO ORDERED.

ENTERED: July 15, 2026

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

29